IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MIKESHA MARTINEZ, et al.,

    Plaintiffs,

  v.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.
_____/

No. C 09-02306 CW

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

    This case is about the implementation of cuts to the wages paid to In-Home Support Services (IHSS) providers, who provide in-home assistance to low-income elderly and disabled individuals through California's Medi-Cal program. The cuts are scheduled to go into effect July 1, 2009. Plaintiffs are a proposed class of individuals who currently receive assistance through IHSS and the unions who represent IHSS providers. In this motion, Plaintiffs seek to enjoin the implementation of the law that will result in cuts to IHSS providers' wages. Defendants Governor Arnold Schwarzenegger, Director of the California Department of Social Services John A. Wagner, Director of the California Department of Health Care Services David Maxwell-Jolly, Fresno County and Fresno County In-Home Supportive Services Public Authority oppose the

motion.[1] The matter was heard on June 25, 2009. Having considered all of the parties' papers and oral argument on the motion, the Court concludes that Plaintiffs have established a strong likelihood of success on their claim that the State Defendants have violated the procedural requirements of the Medicaid Act. The Court also concludes that Plaintiffs will suffer an irreparable injury if the IHSS cuts are implemented and, furthermore, the cuts are reasonably likely to cost the State more money in the long run as individuals currently receiving in-home health services are required to turn to institutionalized care due to the difficulty of finding IHHS providers willing to work for the reduced wages. Accordingly, the Court grants the preliminary injunction.

## BACKGROUND[2]

In 1973, California established the IHSS program to provide assistance with the tasks of daily living to low-income elderly and disabled persons "who cannot safely remain in their homes or abodes of their own choosing unless these services are provided." Cal. Welf. & Inst. Code § 12300(a). IHSS providers give services such as assistance with bathing, dressing, cooking, feeding, bowel and bladder care, self-administration of medication and cleaning. Id. § 12300(b), (c). Over 360,000 IHSS providers serve over 440,000 individuals in California. Over sixty-two percent of IHSS

---

[1] Defendant State Controller takes no position in this matter.

[2] The Court takes judicial notice of Plaintiffs' exhibits A through X to their request and the State Defendants' exhibits A and B to their request. These documents consist of legislative history and publications by federal, state, local officials and agencies which contain facts that are not subject to reasonable dispute in that they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

2

recipients are served by a relative.

IHSS is administered by the State's counties. Fifty-six of California's fifty-eight counties have established either a public authority (PA) or a non-profit consortium (NPC) to provide the delivery of IHSS services. Each of these fifty-six counties has created and maintains a registry from which service providers can be drawn. As of June 30, 2007, there were over 14,500 persons in county registries.[3] These PAs and NPCs are considered employers of IHSS providers for some purposes, including collective bargaining agreements pertaining to providers' wages and benefits; however, individual consumers hire, fire and supervise their own IHSS providers. Id. § 12301.6(c)(1).

Each county establishes the providers' wages and benefits. Thus, the rates paid to IHSS providers vary by county. Because most IHSS consumers participate in California's Medicaid program, the federal government pays for about fifty percent of the IHSS program's costs. See 42 U.S.C. § 1396d(b). The State pays sixty-five percent and the county pays thirty-five percent of the remaining half of the program's costs. Cal. Welf. & Inst. Code § 12306. The State's contribution, however, is subject to a statutory cap. Currently, the maximum State contribution is sixty-five percent of the non-federal share of a wage and benefit package of $12.10 per hour. Id. at 12306.1(c)-(d).

Wages and benefits are determined through the collective bargaining process at the county level. Once these wages and benefits are decided, they must be submitted to the California

---

[3] The parties did not provide a more recent estimate for the number of IHSS providers in county registries.

1  Department of Health Care Services to ensure that they comply with
2  all applicable state and federal laws.  Id. § 12306.1(a)-(b).
3      In response to California's unprecedented budget crisis, on
4  February 20, 2009, the Governor signed into law California Welfare
5  and Institutions Code § 12306.1(d)(6).  If that law goes into
6  effect on July 1, 2009, the State's maximum contribution in wages
7  and benefits will be reduced from sixty-five percent of the non-
8  federal share of an hourly rate of $12.10 to sixty-five percent of
9  the non-federal share of an hourly rate of $10.10.  This rate
10 represents $9.50 for wages and $0.60 for benefits.  Counties do not
11 have to reduce wages and benefits and are permitted to make up the
12 difference between the State's current contribution and any
13 reduction that may result from the State's new maximum
14 contribution.
15     Only counties that currently pay IHSS providers more than
16 $10.10 per hour in wages and benefits will see a reduction in the
17 State's contribution to IHSS costs.  Currently, thirty-four of the
18 fifty-six PAs and NPCs pay IHSS providers $10.10 per hour or less
19 in wages and benefits.  Thus, there will be no reduction in the
20 State's contribution to IHSS costs in a majority of the counties,
21 including Los Angeles, where forty-two percent of all IHSS services
22 are provided.  Of the twenty-two counties that currently pay wages
23 and benefits of more than $10.10 per hour to IHSS providers, twelve
24 have notified the State of their intent to reduce IHSS wages in
25 proportion to the anticipated reduction in the State's
26 contribution.  Of those twelve counties, Fresno is the only one
27 named as a Defendant.  The remaining ten counties have existing
28 labor contracts that will not expire until fall, 2009, and the

4

State does not know what each county will do once those contracts expire.

Fresno is the only county Plaintiffs have sued in this case. On September 26, 2006, the Fresno County Board of Supervisors approved a Memorandum of Understanding (MOU) between the Fresno IHSS Public Authority and the Service Employees International Union, California State Council (SEIU).

The MOU identifies specific contingencies which would permit the County to reduce wages and benefits from their current levels:

> If at any time, federal or state IHSS funding, including monies received through the Realignment Act, are reduced and/or suspended, the Public Authority's participation in pay and wages and/or benefits shall be reduced in direct proportion.  The PA shall notify the Union of the extent and implementation date of the reduction.
>
> With respect to state realignment and reimbursements, fluctuations in arrears payments within the normal course of the realignment system/process, as of the date of signing the MOU, are not intended to trigger this section.
>
> Fluctuation in total provider service hours do not reduce or increase the per hour wage/benefit rate.

If the union disagrees with a wage or benefit reduction or with the amount of the reduction, the MOU provides that "the parties agree to submit the issue to a neutral third party fact finder for determination of the necessity for and the amount of the reduction." After the bill enacting § 12306.1(d)(6) was signed into law, the Fresno County Board of Supervisors invoked the contingencies article of the MOU to notify the union that it would be reducing the wage and benefits paid to IHSS providers from the current combined hourly rate of $11.10 to a combined hourly rate of $10.10, effective July 1, 2009.  If the County continued to pay IHSS providers wages and benefits of $11.10 per hour after the

5

State's maximum contribution is reduced to sixty-five percent of the non-federal portion of a payment of $10.10 per hour, it would incur an additional $6 million in costs annually.  The County claims to be in dire financial straits already, with a proposed 2009-2010 budget that anticipates a reduction of $41.44 million in revenues.  The County notes that, as of June 10, 1009, there are 450 pre-qualified IHSS providers on the county provider registry actively seeking work as an IHSS provider.

In their complaint, Plaintiffs allege that the wage reduction provided in § 12306.1(d)(6) will have a substantial financial impact on tens of thousands of IHSS providers throughout the state. Plaintiffs' expert, Economics Professor Candace Howes, estimates that approximately 4,000 providers will leave IHSS employment because of the rate reduction and that 2,700 IHSS consumers will be unable to find replacements.  Howes estimates that over one-fifth of these consumers will try to remain at home without assistance from an IHSS provider, which could be dangerous for the consumer. Roughly half of those unable to find replacement (approximately 1,400) may have to enter skilled-nursing-facilities or other residential institutions.[4]  At the hearing on the present motion,

---

[4] Each side has challenged the admissibility of the evidence submitted by the other side.  However, on a motion for a preliminary injunction, the Court may consider inadmissible evidence, giving such evidence appropriate weight depending on the competence, personal knowledge, and credibility of the declarants. 11A Charles A. Wright, Arthur K. Miller & Mary K. Kane, Federal Practice and Procedure § 2949 at 216-217 (2d ed. 1995); see also Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do (continued...)

defense counsel acknowledged that it costs the State more money to pay for individuals in residential institutions than to pay for home health care services.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S. Ct. 365, 374 (2008). "[T]he required showing of harm varies inversely with the required showing of meritoriousness." Indep. Living Ctr. of S. Cal., Inc. v. Shewry, 543 F.3d 1047, 1049 (9th Cir. 2008) (quoting Rodeo Collection, Ltd. v. W. Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987)). "When the balance of harm 'tips decidedly toward the plaintiff,' injunctive relief may be granted if the plaintiff raises questions 'serious enough to require litigation.'" Id. (quoting Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978)).

## DISCUSSION

I. Likelihood of Success on the Merits

To receive federal financial participation in payment for services that states provide to low income persons who are aged, blind, disabled or members of families with dependent children, states must agree to comply with applicable federal Medicaid law.

---

[4](...continued)
so serves the purpose of preventing irreparable harm.")  Therefore, the Court will exercise its discretion to consider the proffered evidence as appropriate.

7

Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1493 (9th Cir. 1997). The Medicaid Act requires a participating state to develop a state plan which describes the policy and methods to be used to set payment rates for each type of service included in the program. 42 C.F.R. § 447.201(b). A provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A) (hereinafter Section 30(A)), requires, in relevant part, that a state's Medicaid plan:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

Defendants urge that Section 30(A) does not compel the state to conduct any studies or analyses regarding the impact of a rate cut. Defendants rely largely on Sanchez v. Johnson, 416 F.3d 1051 (9th Cir. 2005), which they contend limited the holding in Orthopaedic Hospital to its facts.

In Orthopaedic Hospital, hospital providers sued the California Department of Health Services, claiming that the Director violated Section 30(A) by reducing reimbursement rates without considering the effect of hospital costs on efficiency, economy and quality of care. The Ninth Circuit held that Section 30(A) "provides that payments for services must be consistent with efficiency, economy, and quality of care, and that those payments must be sufficient to enlist enough providers to provide access to Medicaid recipients." Orthopaedic Hosp., 103 F.3d at 1496 (emphasis in original). The Ninth Circuit concluded that, under Section 30(A),

8

> the Director must set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs. To do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting.

Id. The court also concluded, "It is not justifiable for the Department to reimburse providers substantially less than their costs for purely budgetary reasons." Id. at 1499 n.3.

Subsequently, in Sanchez v. Johnson, 416 F.3d 1051, 1060 (9th Cir. 2005), the Ninth Circuit held that Section 30(A) does not confer individual rights that are enforceable under 42 U.S.C. § 1983.[5] Sanchez left undisturbed the rule announced in Orthopaedic Hospital that Section 30(A) "requires the state to consider efficiency, economy, quality of care, and access before setting Medi-Cal reimbursement rates." California Pharmacists Assoc. v. Maxwell-Jolly, 563 F.3d 847, 850 (9th Cir. 2009) (citing Orthopaedic Hosp., 103 F.3d at 1496).

Here, the State Defendants concede that the California legislature did not consider the Section 30(A) factors when it adopted California Welfare and Institutions Code § 12301(d)(6). The bill implementing § 12301(d)(6) states only that the new law "addresses the fiscal emergency declared by the Governor by proclamation on December 19, 2008." No analysis in the legislative history mentions the impact of the provision on access to care or the quality of care.

---

[5] However, in Independent Living Center of Southern California, Inc. v. Shewry, 543 F.3d 1050, 1058 (9th Cir. 2008), the Ninth Circuit held that a plaintiff may sue for injunctive relief directly under the Supremacy Clause. Here, Plaintiffs sue under that clause.

Defendants argue that they need not consider the Section 30(A) factors because the wages and benefits paid to IHSS providers are set by the counties' PA or NPC, often after collective bargaining. Defendants assert that the State has no influence in determining what the wages will be in each county. However § 12306.1(d)(6) has a direct influence on the wages for each county because it reduces the maximum payment towards wages and benefits that the State will contribute. Through § 12306.1(d)(6), the State directly informed all counties that it would no longer be able to contribute more than sixty-five percent of the non-federal portion of $10.10 per hour in wages and benefits. Further, a county's role in determining IHHS wages and benefits does not preclude the State from analyzing the impact of Section 12306.1(d)(6) on the Section 30(A) factors prior to enactment. Accordingly, the Court concludes that Plaintiffs have made a strong showing of likelihood of success on the merits that Defendants violated the procedural requirements of Section 30(A).

Because the Court concludes that a preliminary injunction is warranted based on Plaintiffs' likelihood of success on their procedural claim, the Court need not determine the likelihood of Plaintiffs' success on their claim that Defendants violated the substantive requirements of Section 30(A) or their claim that Defendants violated the Americans with Disabilities Act.

II.   Irreparable Harm, Balance of Hardships and the Public Interest

IHSS consumers will suffer immediate and irreparable harm unless the Court issues a preliminary injunction. The wage reductions will cause many IHSS providers to leave employment, which in turn will leave consumers without IHSS assistance. The

10

consumers' quality of life and health-care will be greatly diminished, which will likely cause great harm to disabled individuals. For instance, the declarations submitted by Plaintiffs describe harms ranging from going hungry and dehydration, to falls and burns, to an inability ever to leave the home. Institutionalizing individuals that can comfortably survive in their home with the help of IHSS providers will "cause Plaintiffs to suffer injury to their mental and physical health, including a shortened life, and even death for some Plaintiffs." Crabtree v. Goetz, 2008 WL 5330506, at *30 (M.D. Tenn.).

IHSS providers will also suffer immediate and irreparable harm. Although financial injury is generally not adequate to establish irreparable harm, L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 643 F.2d 1197, 1202 (9th Cir. 1980), financial harm to the IHSS providers is irreparable because retrospective monetary damages are unavailable due to the State Defendants' Eleventh Amendment immunity. California Pharmacists, 563 F.3d at 851-52 ("[B]ecause the Hospital Plaintiffs and their members will be unable to recover damages against the Department even if they are successful on the merits of their case, they will suffer irreparable harm if the requested injunction is not granted.")

The balance of hardships and the public interest also weigh in Plaintiffs' favor. If the preliminary injunction does not issue, the State Defendants' sole injury will be the financial costs associated with continuing to participate under the current IHSS provider wages. The Court notes that there is persuasive evidence that the wage cuts will actually cost the State tens of millions of additional dollars because in-home care is considerably less

11

expensive than institutionalized care and IHHS providers reduce the need for expensive emergency room visits. Accordingly, the financial loss the State will suffer if Section 12306.1(d)(6) is not implemented does not outweigh the hardship Plaintiffs would suffer absent an injunction. Lastly, the public interest weighs heavily in favor of granting relief. "It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time." Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983).

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction. As set forth in the separately filed preliminary injunction, Defendants are enjoined and restrained from implementing California Welfare and Institutions Code § 12306.1(d)(6) without first conducting the analysis required by Section 30(A), as described in Orthopaedic Hospital.

IT IS SO ORDERED.

Dated: 6/26/09

CLAUDIA WILKEN
United States District Judge